OLE LEGVOLD, Appellee, v. ED L. OLSON, Appellant.

**VENDOR AND PURCHASER:** Action for Damages—Conditions Precedent. A party to a contract of sale or exchange of properties must, before he can maintain an action for resulting damages, establish:

1. That he has fully performed the contract, or has tendered full performance, or is able to fully perform, *and*

2. That the other party to the contract is in default.

*Appeal from Hamilton District Court.*—E. M. McCALL, Judge.

SEPTEMBER 19, 1922.

REHEARING DENIED DECEMBER 15, 1922.

ACTION to recover liquidated damages specified in a written contract for the sale of real estate, claimed to have been breached by the defendant. The court directed a verdict in favor of the plaintiff in the sum of $2,000, the damages specified in the contract. Defendant appeals.—*Reversed and remanded.*

*O. J. Henderson,* for appellant.

*Lee & Garfield* and *Martin & Alexander,* for appellee.

FAVILLE, J.—In 1917, the appellee was the owner of a farm

of 240 acres, located in the state of Minnesota, and the appellant owned a farm of the same size, located in Hamilton County, Iowa. Each of said farms bore incumbrances, and, according to their respective values, the equities in said farms were substantially equal. On September 26, 1917, the parties entered into a written contract for the exchange of said properties. It was provided by said contract that appellee was to sell and convey the Minnesota land to the appellant, subject to a mortgage of $8,000, due March 1, 1922, and subject to a lease ending March 1, 1919. The contract provided that the appellee was to convey said property by warranty deed, and furnish an abstract brought down to date of transfer, showing a good and sufficient title in the grantor. The contract provided that the appellant was to convey the Hamilton County land by warranty deed, and also furnish an abstract of title brought down to date of transfer, showing good and sufficient title in the grantor. The contract contained the following clause:

"And it is further agreed that the said conveyances shall be made on or before March 1, 1918, and possession of the same to be delivered March 1, 1918, to each other, and the parties hereunto bind themselves, their heirs, executors and administrators, each unto the other, in the sum of two thousand ($2,000) dollars, which they hereby agreed upon as liquidated damages, to be paid by the said parties failing to comply with his covenants contained in this agreement."

It is to be observed from the foregoing that the appellant, under the terms of said contract, was to convey his land subject to a mortgage thereon of $30,700, due February 1, 1920. It was afterwards discovered that the said mortgage was due February 1, 1919, instead of one year later, and thereby hangs the story of this lawsuit.

On November 28, 1917, the appellee entered into a written contract with one Taylor, whereby he agreed to convey to the said Taylor, in exchange for certain properties, the Iowa land which he had contracted to purchase from the appellant. The appellant knew nothing of this contract between the appellee and Taylor until shortly before March 1, 1918. Appellant did not occupy the Iowa farm in person, and it appears that Taylor

rented the land to a tenant, who took possession on or about March 1, 1918.

Appellee executed a warranty deed to the Minnesota farm on October 8, 1917, and instructed the Huxley Savings Bank to forward it to the bank at Randall, for delivery to appellant at the time settlement was to be made.

On March 1, 1918, the parties met at the bank at Randall. At that time, the appellee did not have his abstract to the Minnesota farm present. His claim is that it had been sent by mail, and had been misdirected. Appellant had his abstract with him. It had not been extended to date. Appellant testified that, just before the first of March, he had discovered that the mortgage of $30,700 on the farm was due February 1, 1919, instead of February 1, 1920, as provided in the contract. At the meeting at Randall on March 1st, the banker started to draw the deed for appellant to sign, when the error regarding the due date of the mortgage was mentioned. The banker advised appellant to pay the $2,000 and drop the deal. Appellant testified:

"I told him that I would not back out on the deal, and we were waiting for Kalseim to come back from the funeral. We finally gave it up for that day and I told them I wanted some time to think it over; and when I come to find out, Legvold didn't have his abstract there, and talked and fooled around; and Taylor told me, if I would stand the difference in the interest for one year, he would fix it up. Q. What arrangement was made about the abstract? A. When he didn't have his abstract there, we couldn't fix it up. He said, as soon as he got his abstract, he would send it to Smedal. Legvold said that whatever Taylor and I agreed on was all right to him, and Taylor wanted some time to think it over, and we left it that way. About train time, Legvold came back and asked me what I was going to do, and how soon I could fix it up; and I told him, just as soon as I could get around to it. He asked me where I was going to send the papers. I asked him where he wanted me to send them, and he said, 'To the Union National Bank at Ames.' I told him, 'All right.' That is all the conversation we had that day. At that time, I had not taken possession of the Minnesota farm, but Taylor was in possession of my farm."

Taylor, a witness in behalf of the defendant, testified:

"We were in the back end of the Randall bank; started to make the deeds, and it came up that the mortgage came due in 1919, and the contract called for 1920. It was suggested that the deeds should be made across from Olson to me. Mr. Olson didn't see it that way; he thought the deed ought to follow the contract. I had never submitted my contract to him. The banker told me it would be all right to deed straight across, if we could all agree, and prorate the expense. He said that would be all right, and Mr. Olson agreed to that. Mr. Legvold said anything that was satisfactory to Taylor was satisfactory to him. They agreed on the expense, and started to make the deed, and run up against this proposition of the mortgage. I didn't have much to say, because my contract didn't come from Olson; but I finally suggested that, if he would make a deed, and leave it at this bank or any other bank, it was satisfactory to me, until I saw fit to settle; or if he would sign an agreement to make up this one year's interest from 1919 to 1920, I would accept it. He refused to do it that way. Said he didn't know very much about business, hadn't traded very much, and he wanted a day or two to study on it. * * * I agreed to go ahead with the deal and accept the mortgage as it was, if he would make up the one year's interest, whatever it cost me, in case I would have to put on a new loan; but I didn't think I would have to put on a new loan, if my money came in as I was figuring on it: I would have my own money to pay it off, and it would cost me nothing. Olson said he would not make the deed that day; that he wanted a few days to study about it. * * * I learned afterwards that Olson executed a deed, and sent it to the Union National Bank at Ames. He sent his abstract, which I got possession of, a short time after the first of March. I approved the title. * * * Mr. Olson signed the agreement to take care of the excess interest, about the fifteenth of June, 1918. I asked to have that kind of agreement, and he refused until that time to give it. * * * There was nothing agreed as to how much time Olson was to have, to fix this matter up."

Appellant further testified:

"The talk was that whatever would suit Taylor would suit Legvold: that is, Legvold told me that, if Taylor would take this land, it would be all right with him. Taylor wanted to see

how much more it would cost him to carry the loan the extra year. He said, if I would pay the difference, he would take it. I didn't. refuse to make out my deed.''

On March 5th, the appellant made out a deed to the Hamilton County farm. The deed was made subject to a mortgage of $30,700, due February 1, 1919, at five per cent interest; and appellant sent this deed and abstract to the Union National Bank, at Ames, on March 5th, or the next day. On March 9th, the attorney for appellee wrote appellant, demanding the $2,000 liquidated damages, and threatening suit. Appellant testified that he went to Ames to see appellee's attorney, after receiving· this letter, but that the attorney was out of town. He says that he went two or three times to see the attorney.

One Judge was agent for Taylor in this matter. He had several interviews with appellant in regard to the matter, after March 1st, and on June 15th, drew a stipulation of settlement between Taylor and Olson. On the following day, Judge notified appellee that appellant and Taylor had reached a satisfactory settlement, but appellant refused to do anything in the matter. This suit ·had been previously started, April 26th.

Taylor held possession of the Hamilton County land for two years, by his tenant, and settlement was finally made with appellant for the rentals.

Both parties moved for a directed verdict. Appellant's motion was overruled, and appellee's sustained.

I.   We must examine the record in the light most favorable to appellant, under such circumstances.

It is contended that, under the record, the appellee was not entitled to a directed verdict in his behalf, because there was no sufficient allegation or proof of a tender of performance or of ability to perform, on the part of the appellee. It is fundamental that, before one party to a contract can maintain an action at law for damages for a breach thereof, the opposite party must be in default on the contract. It is also fundamental that, before a party to a contract can recover damages for a breach of the same against the other party, even though the latter may be in default, the former must establish his own ability to perform, or his full performance or tender of performance of the contract on his part. One cannot recover damages at law for a

breach of a contract, where he is not shown to be capable of full performance of the contract himself.

Applying these rules to the instant case, the appellee could not successfully maintain this suit for damages until he established two things: (1) the default of the appellant in the performance of the contract; and (2) his own ability to perform according to its terms.

As to the first of these, the appellee could put the appellant in default on the contract by a tender of full performance on his own part and a demand for performance by the appellant. This is not, however, the only manner in which a party may be put in default on a contract, so that an action may be maintained for damages. The party may concede his default and admit his inability to perform, or he may, at the time fixed for performance, repudiate the contract, and refuse to perform. In such event, he is in default, and an action may be maintained for damages for breach of the contract.

In the instant case, the parties came together for settlement on March 1st. The contract provided for settlement on that date, although time was not made of the essence of the contract. At said time, the appellant admitted his inability to perform according to the terms of the contract. He did not, as appellee contends, "absolutely refuse" to perform. On the contrary, at that time he told the appellee that he "would *not* back out on the deal." He also says: "We finally gave it up for that day, and I told them I wanted some time to think it over." The appellant, then, was in default at that time, according to his own testimony. His default occurred, not by reason of any tender and demand on the part of appellee, placing him in default, but by reason of the fact that he could not perform at that time, and admitted his inability to do so. With this condition confronting them, the parties entered into an agreement regarding the matter. Appellant's evidence is to the effect that the appellee agreed with appellant, at the time, that whatever arrangement the latter could make with Taylor, the purchaser from appellee, would be satisfactory to the appellee. Taylor also wanted some time to think it over. Appellant also contends that, inasmuch as neither party had his abstract ready for submission, it was mutually agreed that the abstracts should

be secured, and that appellee was to send his to Randall for examination, and appellant was to send his deed and abstract to Ames.

In his amended and substituted petition, the appellee alleged:

"That on or prior to March, 1918, the plaintiff and defendant orally agreed that the abstracts to be furnished by them respectively for the properties to be conveyed by them need not be furnished by the first of March, but that the same would be submitted by said parties within a reasonable time thereafter, and a reasonable time be allowed for the examination thereof; but that the deeds should be executed on or before March 1st."

So both parties agree that there was some sort of an oral agreement between them that day, and we must accept the contention of the appellant that the appellee agreed that appellant should endeavor to adjust the matter of the mortgage with Taylor, and that both parties were to procure their abstracts and deposit the same for examination.

As before stated, the appellant was confessedly in default at that time; for he could not perform according to the contract. But time was not of the essence of the contract, and besides, the appellee waived the present and immediate performance of the contract, and granted appellant time in which to remedy the matter which placed him in default. No time was fixed in which he should do this. The law would allow him a reasonable time. What was such reasonable time would be a question for a jury.

On the fifth day of March, the appellant executed his deed, and deposited it with his abstract in the bank at Ames. The mortgage matter, however, had not at that time been adjusted.

On the ninth day of March, the appellee by letter demanded performance by the appellant, and threatened suit for damages, but at said time made no tender of the abstract on his part.

There is evidence that the appellant made several trips to Ames, for the purpose of seeing the attorney for the appellee and endeavoring to adjust the matter. There is also evidence to the effect that the appellant refused to accede to the terms imposed by the agent of Taylor until on or about June 15, 1918, when a stipulation was entered into between them which was satisfactory to Taylor.

This suit was begun on or about April 26, 1918, before the appellant and Taylor had reached their agreement.

The question whether appellant, under the circumstances disclosed, acted within a reasonable time, and did within a reasonable time obviate the default in which he had been placed, and was within a reasonable time in a condition to fully perform, was a fact question for a jury.

On June 15th, the appellee was notified that appellant had adjusted the mortgage matter with Taylor, and was in a position to perform.

If it be conceded that appellant was in default, and even if it be conceded that he did not remove that default within a reasonable time (which is a fact question), still we must meet the question as to whether or not the appellee established his right to recover damages for a breach of the contract. In no event could he recover damages unless he was in a position to perform, even though appellant was in default. He never tendered performance on his part by furnishing appellant an abstract, as his contract required. He did not offer any abstract in evidence. He made no proof that his abstract showed good and marketable title, as the contract required. He claims in his petition that appellant waived a tender of the abstract on March 1st, and gave him a reasonable time in which to procure and deposit the abstract. But his evidence shows that he never did so deposit the abstract, nor produce the same upon the trial, nor offer any proof that the same showed a marketable title to the land. The appellant was in default on March 1st. So was the appellee. Granting that appellant did not obviate the default within a reasonable time, and that a jury might have so found, is this sufficient to entitle appellee to recover, upon the record? Even if one party to a contract is in default, the opposite party must still establish, in some proper manner recognized by the law, his own ability to perform, or he is not entitled to recover damages. We fail to find in the record any proof of appellee's ability to perform on his part. He admits that he never tendered any abstract to the appellant. That the furnishing of such an abstract was a material part of the contract between the parties cannot be gainsaid. There is no claim that the appellant has waived performance of the contract in

this regard, except by an extension of time to appellee; but the trouble with appellee's position is that he *never* performed or tendered performance, or proved an ability to perform on his part. How, then, can he recover damages, even though the appellant was in default? Without proof of an ability to perform, or a tender of performance on his part, the appellee could not recover damages for breach of the contract, even if appellant was in default.

Let us assume that the abstract to appellee's land did not show a good and marketable title thereto, could he still recover damages against appellant, even though appellant could not perform on his part? Certainly not. It was essential to appellee's right of recovery to establish, not only the breach on the part of the appellant, but likewise his own ability and readiness to perform the obligations of the contract on his part. We see no escape from the conclusion that appellee failed to establish that he was entitled to recover any damages in the instant case. As bearing on the question involved herein, see *Smutz v. Holliday*, 186 Iowa 784; *Miller v. McConnell*, 179 Iowa 377; *Waters v. Pearson*, 163 Iowa 391.

The appellant's motion for a directed verdict at the close of appellee's evidence, which was renewed at the close of all the testimony, should have been sustained.

The judgment of the trial court is reversed, and the cause is remanded for new trial.—*Reversed and remanded.*

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.